UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| KENNETH KLYNSMA & LINDA KLYNSMA, Personal Representatives of the Estate of ADAM D. KLYNSMA, deceased,<br><br>          Plaintiffs,<br><br>     vs.<br><br>HYDRADYNE, LLC, f/k/a HYDRADYNE HYDRAULICS, LLC; T.J. WELDING & FABRICATION CO.; CAMBCO INC.,<br><br>          Defendants. | CIV. 13-5016-JLV<br><br><br>ORDER |

## INTRODUCTION

Pending before the court are two motions for summary judgment and one

motion to compel discovery.   Defendant Hydradyne, LLC ("Hydradyne") moves

the court for summary judgment on all of Kenneth and Linda Klynsma's

("plaintiffs' ") claims.[1]   (Docket 38).   Hydradyne also seeks to compel plaintiffs'

response to requests two, three and four of its second set of requests for

production of documents.   (Docket 32).   Defendant T.J. Welding & Fabrication

Co. ("TJW") moves the court for summary judgment on all of plaintiffs' claims.

(Docket 60).   Plaintiffs oppose all motions.   The court previously granted

---

[1]Kenneth and Linda Klynsma are the personal representatives of the estate of their son, Adam D. Klynsma, who perished following the events giving rise to this suit.

defendants' unopposed motion for partial summary judgment on plaintiffs' claim for compensatory damages for the pain and suffering endured by Adam Klynsma ("Adam") before his death.   (Docket 87).   Defendant Cambco, Inc. ("Cambco") has not noticed an appearance in the case.   The court first addresses defendants' motions for summary judgment followed by Hydradyne's motion to compel.

## FACTS[2]

Hydradyne "is a Georgia limited liability company with an office address of 15050 FAA Boulevard, Ft. Worth, TX, 76155."   (Docket 40 at ¶ 1).[3]   Cambco, is a Texas corporation.   (Docket 47-1 at p. 2).   Cambco "designed the [Cambco] Cambering Machine model 420, serial number 200122 that was involved in Adam Klynsma's accident."   (Docket 40 at ¶ 3).[4]   "A [c]ambering [m]achine is a

---

[2]For purposes of judicial economy and because there is a significant overlap in relevant facts, the court combines its recital of the facts for both motions for summary judgment.

[3]Where a fact is not disputed the court references only the originating document as identified on the court's online docket.

[4]Where plaintiffs respond to a defendants' statement of material facts with the boilerplate language similar to "[n]ot disputed, subject to the [r]esponse to [s]tatement 2 above" or "[s]ee [r]esponse to TJW's [s]tatement No. 2" and plaintiffs' responses to those prior factual assertions are inapplicable to the current factual statement, the court interprets plaintiffs as not disputing the fact.   See, e.g., Dockets 45 at ¶ 3 Response (plaintiffs' arguments regarding whether Cambco is a continuing viable corporation are inapplicable to whether Cambco designed the machine in question); 63 at ¶ 3 Response (plaintiffs' arguments regarding the obligations and duties imposed by the standards of the Occupational Safety and Health Administration ("OSHA") and the American National Standards Institute ("ANSI") are inapplicable to the language of Cambco's purchase order with TJW.).

hydraulic machine designed to put a curve or camber into certain metal I-beams." (Docket 61 at ¶ 18). TJW contracted with Cambco to "[f]abricate and assemble one [Cambco] Model 420 cambering machine [serial number 200122] in strict accordance with [Cambco] drawings 1 through 4." (Dockets 61 at ¶ 2; 61-2). "On or about June 15, 2001, TJW contracted with [Cambco] . . . to assemble a portion of a machine, pursuant to plans and specifications provided entirely by [Cambco], which was then marketed and sold by [Cambco] as the 'Cambco Cambering Machine 420.' " (Docket 61 at ¶ 1). Cambco's purchase order to TJW stated:

> [Cambco] shall furnish all hydraulic componets [sic] (cylinders, valves, power unit, hoses, fittings and two pins for framework). [TJW] shall furnish all other materials, and hydraulic fluid. All of the above for the total price of $10,400.00. All drawings and other information furnished by [Cambco] shall remain the property of [Cambco], and shall be treated with strict confidentiality by [TJW]. The drawings shall not be used for any purpose other than completing this order unless expressly authorized in writing by [Cambco]. TJW shall be laboratory inspected.

(Docket 61-2).

"Other than the [p]urchase [o]rder and drawings, there were no other written agreements between TJW and [Cambco] (or any other entity) concerning the assembly or design of the [c]ambering [m]achine." (Docket 61 at ¶ 4). "Pursuant to the terms of the [p]urchase [o]rder [Cambco] provided 'all hydraulic components (cylinders, valves, power unit, hoses, fittings and two pins for framework)' for the [c]ambering [m]achine." Id. at ¶ 6. "TJW assembled the [c]ambering [m]achine in accordance with [Cambco's] plans and specifications

3

using the hydraulic components provided by [Cambco] (cylinders, valves, power units, hoses, fittings and two pin[s] for framework)."   Id. at ¶ 15.

Cambco "designed the . . . [c]ambering [m]achine . . . that was involved in Adam Klynsma's [death]."[5]   (Docket 45 at ¶ 3).   TJW did not design, develop, inspect, test, market, advertise or label the cambering machine.   (Docket 61 at ¶ 13).   "TJW did not sell or distribute the [c]ambering [m]achine to the general public."   Id. at ¶ 14.   "None of the work performed by TJW broke or otherwise failed, but, rather, the cause of . . . [Adam Klynsma's death] was . . . an alleged design error."[6]   Id. at ¶ 17.

Cambco "hired a third party entity to inspect and test the [c]ambering [m]achine at TJW's facility before the product shipped."   Id. at ¶ 8.   The third party inspected "the [c]ambering [m]achine welds (which it passed) on or about October 22, 2001."   Id. at ¶ 9.   Cambco "approved and accepted the [c]ambering [m]achine as being assembled in conformance with its specifications."   Id. at ¶ 12.   Cambco "arranged for the shipping of the [c]ambering [m]achine from TJW to [Adam Klynsma's] employer, Dakota Steel, on or about March 26[-28], 2002."   Id. at ¶ 10.   "TJW was not responsible for shipping the [c]ambering [m]achine to any end user, including [Dakota Steel]." Id. at ¶ 11.   Cambco "sold and delivered the [c]ambering [m]achine to . . . Dakota

---

[5]Plaintiffs' assert OSHA regulations and ANSI provisions imposed a duty on TJW to correct the alleged design defect.

[6]Plaintiffs assert TJW was a party to the design error.

4

Steel[] on or before April 15, 2002."   Id. at ¶ 16.   Alliance Trucking delivered the

cambering machine to Dakota Steel.   (Docket 40 at ¶ 6).

On April 1, 2008, Hydradyne and Cambco entered into a purchase

agreement.   (Docket 42-1).   Cambco gave Hydradyne:

> [W]ithout limitation, full access to and exclusive, except for
> [Cambco's] own use for reference, possession of all plans, drawings,
> specifications, customer records, website, [Cambco's] telephone
> number, business records, marketing information, pricing
> information, and any other documents and information, whether
> stored in written form or solely on computer, relevant or relating to
> the design, production, and/or sale of cambering machines
> designed by [Cambco].

Id. at p. 2.

> Cambco further provided Hydradyne:

> [W]ithout limitation, the exclusive right to build the cambering
> machines designed by [Cambco], in consideration for which
> [Hydradyne] shall pay to [Cambco] ten (10%) per cent [sic] of the
> purchase price of each unit sold for the first year commencing with
> the effective date of this agreement; nine (9%) of the purchase price
> of each unit sold during the second year of this agreement; eight
> (8%) of the purchase price of each unit sold during the third year of
> this Agreement; and continuing with a one percent decrease in said
> fee for each year thereafter until the completion of ten years from the
> date of the agreement. . . .

Id.

Cambco granted Hydradyne "without limitation, the exclusive right to sell

'hydraulics and design kits' for cambering machines" under the same ten-year

decreasing profit sharing arrangement outlined above.   Id. at 3.   In the

purchase agreement Hydradyne acknowledged:

5

> [Cambco] is the owner of the design, 'know-how", [sic] and process of designing and manufacturing [the] cambering machines, including the technical information, drawings, pictures, etc., which will be furnished to [Hydradyne], and [Hydradyne] agrees that all such information will remain the property of [Cambco] until the conclusion of the ten year royalty period, at which point the information will become the property of Hydradyne.

Id. at 4.

Hydradyne agreed to "make copies of all manuals distributed to customers purchasing cambering machines."   Id.   The purchase agreement provided "[a]ll cambering machines manufactured during the ten year period for royalty payments shall be marked with a serial number that can be traced to Hydradyne, as manufacturer."   Id. at 4-5.   The purchase agreement provided that "[i]t is understood and agreed that [Hydradyne] will sell the cambering machines it builds to customers of its own, as well as the current and former customers of [Cambco]."   Id. at 5.   Finally, Cambco represented that it was unaware of any prior claim brought or alleged as a result of "any alleged defect in the design of [the] cambering machines."   Id. at 6-7; Docket 40 at ¶ 21.

Neither Dakota Steel nor TrueNorth Steel ("TrueNorth"), which acquired Dakota Steel, had a service contract for the cambering machine with Hydradyne prior to Adam's death.[7]   (Dockets 40 at ¶¶ 12-13; 41-6 at pp. 2-3; 42 at ¶¶ 6-7).   Adam was employed by TrueNorth at the time of his death.   (Dockets 41-2 at

---

[7]The court overrules plaintiffs' relevancy objection under Fed. R. Evid. 401 and finds the probative value of the evidence is not substantially outweighed by the factors set out in Fed. R. Evid. 403.   Where the court includes defendants' statements of material fact despite plaintiffs' relevancy objection, the court's ruling is the same.   See infra.

pp. 9-11; 41-3).   Neither Dakota Steel nor TrueNorth had experienced an incident with the cambering machine prior to Adam's death.   (Dockets 40 at ¶¶ 14-15; 41-1 at p. 2).

On the afternoon of April 26, 2012, Adam attempted to straighten a highway expansion joint, a weldment, in the cambering machine.   (Docket 41-2 at pp. 9-10).   The highway expansion joint was approximately 15 feet long, 7 inches tall and 1 foot wide, weighing approximately 1600 pounds.   Id. at 10. Adam "fabricated [two] hangers from flat bar and tubular steel to further support the weldment in the camber[ing] machine."   Id.   "[T]his was a new type of expansion joint weldment that TrueNorth Steel had never built before and that this was the first attempt at straightening a weldment of this type."   (Docket 41-2 at p. 14).   "Upon experiencing problems with tolerance levels, [Adam] went to his supervisor Shannon Hanson for direction."   (Docket 40 at ¶ 23).   Ms. Hanson told Adam that she and Bradley Wentz, the person in charge of quality control at TrueNorth, would tackle the project with Adam in the morning. (Docket 41-3 at pp. 3-5).

The next morning, April 27, 2012, Adam, by himself, began working on the cambering weldment.   Id. at 14-15.   Ms. Hanson assumed that Adam would begin working on the weldment while she was at the morning's production meeting.   Id. at 15-17.   During Adam's work on the weldment at the cambering machine, "[a]s more pressure was applied the weldment began to slip and become unstable[, and] the weldment suddenly released from the camber

machine and was propelled upwards and backwards toward [Adam]."   (Docket 41-2 at p. 15).   The weldment struck Adam in the head and knocked him backward onto the floor before coming to rest on his chest.   Id.   The cause of Adam's death was blunt force trauma.   Id.

Hydradyne first received information relating to the cambering machine incident in May 2012 when Jim Rudlang of TrueNorth contacted Matt Strum about hydraulic components needed for modifications.   (Docket 40 at ¶ 17). Except for Adam's death, Hydradyne was not aware of any other incidents involving its cambering machines.   Id. at ¶ 18.

## DISCUSSION

### 1.   Standard Applicable to Summary Judgment Motions

Under Fed. R. Civ. P. 56(a), a movant is entitled to summary judgment if the movant can "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Only disputes over facts that might affect the outcome of the case under the governing substantive law will properly preclude summary judgment.   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).   "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."   Id. at 247-48 (emphasis in original).

In determining whether summary judgment should issue, the facts and inferences from those facts must be viewed in the light most favorable to the

8

nonmoving party.   Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986).   In order to withstand a motion for summary judgment, the nonmoving party "must substantiate [their] allegations with 'sufficient probative evidence [that] would permit a finding in [their] favor on more than mere speculation, conjecture, or fantasy.' "   Moody v. St. Charles County, 23 F.3d 1410, 1412 (8th Cir. 1994) (citing Gregory v. Rogers, 974 F.2d 1006, 1010 (8th Cir. 1992)).

In assessing a motion for summary judgment, the court is to "consider only admissible evidence and disregard portions of various affidavits and depositions that were made without personal knowledge, consist of hearsay, or purport to state legal conclusions as fact."   Howard v. Columbia Public School District, 363 F.3d 797, 801 (8th Cir. 2004); see Fed. R. Civ. P. 56(e) (a party may not rely on his own pleadings in resisting a motion for summary judgment; any disputed facts must be supported by affidavit, deposition, or other sworn or certified evidence).   The nonmoving party's own conclusions, without supporting evidence, are insufficient to create a genuine issue of material fact. Anderson, 477 U.S. at 256; Thomas v. Corwin, 483 F.3d 516, 527 (8th Cir. 2007); Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc).

**2.     TJW's Motion for Summary Judgment**

The court first addresses TJW's motion for summary judgment as to plaintiffs' strict liability claims for a design defect and failure to warn, negligence and breach of warranty.

**A.     Strict Liability in Product Liability Cases**[8]

South Dakota law controls the substantive issues in this diversity case. See Denekamp v. Hetronic USA, Inc., No. CIV. 06-5025-KES, 2008 WL 4646954, at *2 (D.S.D. Oct. 17, 2008) (citing Integrity Floorcovering, Inc. v. Broan–Nutone, LLC, 521 F.3d 914, 917 (8th Cir. 2008)).   The South Dakota Supreme Court recognizes strict liability in tort for product liability cases and adopted the Restatement (Second) of Torts § 402(A).   Engberg v. Ford Motor Co., 205 N.W.2d 104, 109 (S.D. 1973), disapproved on other grounds by Smith v. Smith, 278 N.W.2d 155 (S.D. 1979).   Section 402A of the Restatement (Second) of Torts provides:

>   (1)   One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
>
>         (a)   the seller is engaged in the business of selling such a product, and
>
>         (b)   it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

---

[8]This portion of the court's analysis applies equally to plaintiffs' strict liability claims against Hydradyne.

(2)     The rule stated in Subsection (1) applies although

    (a)     the seller has exercised all possible care in the preparation and sale of his product, and

    (b)     the user or consumer has not bought the product from or entered into any contractual relation with the seller.

(Restatement (Second) of Torts § 402A); see also Denekamp, 2008 WL 4646954, at *2.

In product liability cases, "[t]hree broad classes of defects have emerged: manufacturing defects where individual products within a product line are improperly *constructed, design* defects involving the entire product line, and defect by *failure to properly warn* or instruct users of a product where such failure renders the product hazardous." Peterson v. Safway Steel Scaffolds Co., 400 N.W.2d 909, 912 (S.D. 1987) (emphasis in original).

Plaintiffs assert defendants are strictly liable by reason of a design defect in the cambering machine and by a failure to warn. See Dockets 13 at ¶ 8; 63 at ¶ 17 (Plaintiffs do not dispute that none of the work performed by TJW broke or otherwise failed. Plaintiffs agree "the cause of Adam's death was a design error."). Plaintiffs assert the design of the cambering machine is defective because it failed to incorporate adequate protective devices to safeguard the operator from the expulsion of material from the cambering machine and because of the placement of the operator controls. (Docket 13 at ¶ 8). Plaintiffs also allege the defendants failed to warn or instruct that there was no machine

11

guarding protecting the operator from the expulsion of material from the cambering machine.   Id.

### i.    Design Defect

In a design defect claim, "[s]trict liability arises when a manufacturer 'sells any product in a defective condition unreasonably dangerous to the user or consumer . . . .'"   Burley v. Kytec Innovative Sports Equip., Inc., 737 N.W.2d 397, 408 (S.D. 2007) (quoting Peterson, 400 N.W.2d at 912 (citations omitted)).   "The plaintiff is not required to prove that the defendant[] knew or should have known of the defective nature of the product."   Denekamp, 2008 WL 4646954, at *3 (citing Peterson, 400 N.W.2d at 912).   "It is the unreasonableness of the condition of the product, not of the conduct of the defendant, that creates liability."   Burley, 737 N.W.2d at 408 (citing Jackson v. Coast Paint & Lacquer Co., 499 F.2d 809 (9th Cir. 1974)).

The court can find no South Dakota case specifically addressing the extent to which a non-designing manufacturer following the specifications of the product's designer may be held strictly liable for an allegedly defective product. Denekamp, 2008 WL 4646954, at *3.   When this absence of state authority occurs, Denekamp provides guidance:

> When this court is applying South Dakota law and the South Dakota Supreme Court has not specifically addressed an issue, the court must determine what the state supreme court "would probably hold were it to decide the issue."   Farr v. Farm Bureau Ins. Co., 61 F.3d 677, 679 (8th Cir. 1995).   In resolving such questions, the court may consider relevant state precedent, analogous decisions, scholarly works, and other reliable dat[a].   See id.   These data

include judicial decisions from other jurisdictions whose doctrinal approach to legal matters is substantially the same as South Dakota's approach.  Wright, Miller, and Cooper, <u>Federal Practice and Procedure: Jurisdiction</u>, 2d § 4507 (2008).

<u>Denekamp</u>, at *3 n.2.

The United States Court of Appeals for the Eighth Circuit articulated the general rule on the issue: "when a product is manufactured according to the specifications, the manufacturer is not liable for the design defects, unless the specifications are so obviously dangerous that they should not be followed." <u>Thompson v. Hirano Tecseed Co.</u>, 456 F.3d 805, 809 (8th Cir. 2006) (collecting cases).   As the Eighth Circuit noted, the general rule comports with the <u>Restatement (Second) of Torts</u> § 404, comment a:

> [T]he contractor is not required to sit in judgment on the plans and specifications or the materials provided by his employer.  The contractor is not subject to liability if the specified design or material turns out to be insufficient to make the chattel safe for use, unless it is so obviously bad that a competent contractor would realize that there was a grave chance that his product would be dangerously unsafe.

<u>Thompson</u>, 456 F.3d at 810 (quoting <u>Restatement (Second) of Torts</u> § 404, cmt. a (1965)).

The court is aware that a minority of jurisdictions may impose strict liability on a non-designing manufacturer.   <u>See</u> <u>Michalko v. Cooke Color & Chem. Corp.</u>, 451 A.2d 179, 183 (1982) ("[T]he fact that the product was built according to the plans and specifications of the owner does not constitute a defense to a claim based on strict liability for the manufacture of a defective

13

product when the injuries are suffered by an innocent foreseeable user of the product."); Hendricks v. Comerio Ercole, 763 F. Supp. 505, 513 (D. Kan. 1991) (holding that the general rule does not apply to strict liability claims, only to negligence claims).

The court finds the Nebraska Supreme Court's analysis of the issue in Moon v. Winger Boss Co., Inc. persuasive.  287 N.W.2d 430, 431 (Neb. 1980). In Moon, an employee in a meatpacking plant tripped and fell while cleaning. Id. at 431.  During the fall, plaintiff's arm "became entangled in the sprocket, chain, and framework located at the takeup end of a moving conveyor-type breaking table."  Id.  Co-defendant Iowa Beef Processors, Inc. ("IBP") designed the equipment without input from Winger Boss.  Id. at 432.  Winger Boss manufactured the conveyor system and breaking tables in accord with IBP's specifications.  Id.  IBP denied Winger Boss physical access to its plant and did not provide Winger Boss with a detailed layout of its plant.  Id.  Moon's claims of strict liability and negligence against Winger Boss were based on an allegedly improper design.  Id.

The Nebraska Supreme Court held a "manufacturer is not liable for injuries to a user of a product which it has manufactured in accordance with plans and specifications of one other than the manufacturer, except when the plans are so obviously, patently, or glaringly dangerous that a manufacturer exercising ordinary care under the circumstance then existing would not follow them."  Id. at 434.  In support of this conclusion, the Nebraska Supreme Court

14

observed, "[t]o hold otherwise would be to engage in speculation and conjecture and to make the manufacturer an insurer as to everyone dealing with the machinery." Id.

The South Dakota legislature's enactment of SDCL § 20-9-10 also leads the court to conclude the State Supreme Court would adopt the majority rule.

> No manufacturer, assembler, or seller of a product may be held liable for damages . . . by reason of the doctrine of strict liability in tort based on a defect in a product or failure to warn . . . where a proximate cause of the injury, death or damage was an alteration or modification of such product made under all of the following circumstances: (1) [t]he alteration or modification was made subsequent to the manufacture, assembly, or sale of the product; (2) [t]he alteration or modification altered or modified the purpose, use, function, design, or manner of use of the product from that originally designed, tested, or intended by the manufacturer, assembler, or seller; and (3) [i]t was not foreseeable by the manufacturer, assembler, or seller of the product that the alteration or modification would be made, and, if made, that it would render the product unsafe.

SDCL § 20-9-10.

South Dakota limited the imposition of strict liability in instances where responsibility for a plaintiff's damage or injury cannot be imputed to the manufacturer or assembler.

For these reasons, the court finds South Dakota would apply the majority rule that a non-designing manufacturer is not liable for design defects when it builds a product in accord with customer specifications. The majority rule contains an important exception. Having determined South Dakota would apply the majority rule, the court addresses whether Cambco's specifications

15

were so obviously dangerous that TJW should not have followed them.

Plaintiffs assert:

> TJW was a party to the design error, because TJW . . . had an *obligation* under applicable [OSHA] standards . . . TJW had *a further duty* under standards promulgated by the [ANSI] . . . . The trier of fact could find that TJW *breached those duties* because the trier of fact could find that the specifications that TJW followed were so obviously dangerous for failure to provide a barrier or other protection that they should not have been followed.

(Docket 63 at pp. 4-5) (emphasis added); <u>see also</u> Docket 62 at p. 3 ("The trier of fact could well conclude that [the standards cited by plaintiffs' expert Dana Mudlin] . . . create a *standard of care* and that TJW breached that standard.") (emphasis added).

Plaintiffs offer no evidence indicating TJW participated in the design of the cambering machine.   <u>See</u> Docket 61 at ¶ 1; <u>cf.</u> <u>Denekamp</u>, at *4.   Plaintiffs agree Adam's death was not caused by the work TJW performed.   <u>See</u> Docket 61 at ¶ 17.   Plaintiffs contend the cambering machine's "failure to provide a barrier or other protection" as well as the location of the operator controls rendered its design obviously dangerous.   (Docket 63 at pp. 4-5).   In support of this assertion, plaintiffs contend because TJW breached a duty of care established by OSHA and ANSI standards, a jury could find Cambco's specifications were obviously dangerous and should not have been followed.

Even under the majority rule "contractor's exception," strict liability, does not depend on a defendant's breach of a duty of care.   <u>Burley</u>, 737 N.W.2d at 408 ("It is the unreasonableness of the condition of the product, not of the

16

conduct of the defendant, that creates liability.").   The court does not accept plaintiffs' invitation to use a negligence duty of care standard as a proxy for the "obviously dangerous" standard established by the majority rule.

Viewing the evidence in the light most favorable to plaintiffs, the court finds that a genuine issue of material fact exists.   Plaintiffs' expert, Dr. Dana Mudlin, opined "[t]he camber machine is designed and constructed so the operator stands inside the structural support beam of the machine."   (Docket 48-1 at p. 22.   The space provides the operator with only nine inches of depth in which to stand.   Id.   The cambering machine did not have safety barriers or guards preventing an ejected weldment from striking the operator.   Id. at 22-23. "Many of the hydraulic hoses and fittings in the . . . cambering machine are exposed and need to be protected from potential damage when transitioning weldments during routine operations and operator entry and exit."   Id. at 23.

TJW provided no evidence demonstrating the design of the cambering machine was not obviously dangerous.   Rather, TJW set forth the majority rule and concluded logic forbids holding a non-designer liable for a design defect. (Docket 60 at p. 8) (citing Garrison v. Rohm & Haas Co., 492 F.2d 346, 351 (6th Cir. 1974)).   Garrison does not recognize the now majority rule in which a non-designing manufacturer may be held strictly liable for a design defect that is obviously dangerous.   TJW asserts the Mudlin report does not reference the company by name and does not opine on the obviousness of the alleged defect. (Docket 66 at pp. 6-7).   These arguments miss the mark.   TJW was the

17

manufacturer of the cambering machine.   (Docket 61 at ¶5) (For these purposes, the term "manufacturer" and "assembler" is a distinction without a difference.).   The same analysis provided by Dr. Mudlin in demonstrating that the cambering machine was defective is also applicable in evaluating whether the cambering machine's design was so obviously dangerous that TJW should not have followed it.

TJW presented no evidence that it made inquiry regarding the lack of a safety barrier.   Cf. Moon, 287 N.W.2d at 432 (The non-designing manufacturer requested access to the meatpacking plant and asked for a detailed plant layout but the requests were refused.).   That there is a difference between a cambering machine with an operator safety guard compared to one without cannot be denied.   Compare Docket 48-1 at p. 21 (Figure 16), with Docket 60 at p. 2 (image).   The court will not substitute its opinion about the obviousness of alleged design defects for that of a jury.   TJW's motion for summary judgment is denied.

### ii.   Failure to Warn

"In failure to warn strict liability claims, the issue is 'whether the manufacturer's failure to adequately warn rendered the product unreasonably dangerous without regard to the reasonableness of the failure to warn judged by negligence standards.' "   Kendall v. Bausch & Lomb, Inc., No. CIV. 05-5066-KES, 2009 WL 1740008, at *12 (D.S.D. June 17, 2009) (quoting Burley, 737 N.W.2d at 409 (citation omitted).   "Plaintiff need not prove that the product

itself was defective." Id. "Instead, 'where a manufacturer or seller has reason to anticipate that danger may result from a particular use of the product, and the manufacturer fails to give adequate warning of such a danger, the product sold without such a warning is in a defective condition within the strict liability doctrine.' " Id. (quoting Burley, 737 N.W.2d at 409-10 (internal quotation marks and brackets omitted).

"To prove a defect through inadequate warnings, a plaintiff, instead of establishing the existence of a defect, must first establish a duty to warn." Id.; see also Peterson, 400 N.W.2d at 912 ("[A]n otherwise properly manufactured and well-designed product may be found to be defective without an adequate warning."). "In failure to warn cases, the factfinder must find the existence of a duty to warn by considering what the defendant knew or reasonably should have known about the product and the risk of injury." Id. (citing McElhaney v. Eli Lilly & Co., 575 F. Supp. 228, 232 (D.S.D. 1983)); see also Burley, 737 N.W.2d at 409; Peterson, 400 N.W.2d at 913. "[T]he foreseeability of the injury is a necessary inquiry in determining whether a defendant breached its duty to warn." Id.

The court's adoption of the majority rule imposing strict liability on a non-designing manufacturer only when the designer's specifications are so obviously dangerous that they should not be followed precludes summary judgment on plaintiffs' strict liability failure to warn claim. TJW's ability to foresee Adam's injury depends in large part on the degree of obviousness, if any,

19

of the alleged defective design of the cambering machine.   Viewing the evidence in the light most favorable to plaintiffs, the jury could determine the design of the cambering machine was obviously dangerous and it was foreseeable that material ejected from the machine would injure the operator in the absence of a safety guard.   TJW's motion for summary judgment is denied.

**B.   Negligence Claims**

   **i.   Defective Design**

"To establish liability in negligence for defective product design . . . a plaintiff must show that the defendant failed to use the amount of care in designing or manufacturing the product that a reasonably careful designer or manufacturer would use in similar circumstances to avoid exposing others to a foreseeable risk of harm."   Burley, 737 N.W.2d at 407 (citing Restatement (Second) Torts § 395).   "To determine whether the designer or manufacturer used reasonable care, one must balance what the designer or manufacturer knew or should have known about the likelihood and severity of potential harm from the product against the burden of taking safety measures to reduce or avoid the harm."   Id. (citing Restatement (Second) Torts § 395).

" 'Whether a manufacturer knew or should have known of a particular risk involves technical issues which do not easily admit to evidentiary proof and which lie beyond the comprehension of most jurors.' "   Id. (quoting Peterson, 400 N.W.2d at 913).   "[A] plaintiff must set forth sufficient evidence establishing a causal connection between the design defect and the resulting injury."   Id.

20

(citing <u>Shaffer v. Honeywell, Inc.</u>, 249 N.W.2d 251, 256 (S.D. 1976), <u>overruled on other grounds</u>, <u>First Premier Bank v. Kolcraft Enterprises, Inc.</u>, 686 N.W.2d 430 (S.D. 2004).   Plaintiffs are not required to "eliminate all other possible explanations of causation that the ingenuity of counsel might suggest."   <u>Id.</u> (citing <u>Shaffer</u>, 249 N.W.2d at 256)).   "A plaintiff need only negate misuse of the product."   <u>Id.</u>   However, unless it is patently obvious that the injury would not have occurred in the absence of a defect, a plaintiff cannot rely merely on the fact that an accident happened.   <u>Id.</u> (citing <u>Shaffer</u>, 249 N.W.2d at 256).

The court already determined a genuine issue of material fact exists as to whether the cambering machine's alleged design defect was so obvious that TJW should not have followed Cambco's instructions.   <u>See</u> <u>supra</u> Part 2.A.i; <u>see</u> <u>also</u> <u>Hendricks</u>, 763 F. Supp. at 513 (Even jurisdictions that do not apply the majority rule in strict liability cases apply it in negligence cases.).   The court finds a genuine issue of material fact exists regarding TJW's alleged negligence in failing to notice an obvious design defect in the cambering machine despite the risk of injury.   The court denies TJW's motion for summary judgment.

### ii.    Failure to Warn

Plaintiffs allege TJW negligently "failed to give adequate and proper instructions and warnings, as to [the cambering machine's] safe use," and failed to "properly warn and instruct concerning parts being expelled from cambering machines." (Docket 13 at pp. 4-5).   The court identifies the six elements of the claim:

21

(1)     the manufacturer knew or reasonably should have known
that the product was dangerous or was likely to be dangerous
when used in a reasonably foreseeable manner;

(2)     the manufacturer knew or reasonably should have known
that users would not realize the danger;

(3)     that the manufacturer failed to exercise reasonable care and
adequately warn of the danger or instruct on the safe use of
the product;

(4)     that a reasonable manufacturer under the same or similar
circumstances would have warned of the danger or instructed
on the safe use of the product;

(5)     that the claimant was harmed; and

(6)     that the manufacturer's failure to warn or instruct was a
proximate or legal cause of the claimant's injury.

Jensen v. Hy-Vee, Corp., No. CIV. 09-4057-KES, 2011 WL 1832997, at *7-8

(D.S.D. May 13, 2011) (quoting Burley, 737 N.W.2d at 410).

TJW did not specifically address plaintiffs' negligent failure to warn claim

in its motion for summary judgment.   See Dockets 60 at pp. 9-10; 66 at pp. 5-6

(addressing only plaintiffs' negligent design defect claim).   Viewing the evidence

in the light most favorable to plaintiffs on their negligent failure to warm claim,

the court finds genuine issues of material fact exist for a jury's determination.

See supra Part 2.A.i & ii.   The court denies TJW's motion for summary

judgment.

### C.     Breach of Implied Warranty

Plaintiffs claim "[d]efendants warranted [the cambering machine] to be

merchantable and reasonably fit and safe for its intended use and that

22

[d]efendants breached said warranties, in that said machine was not merchantable and reasonably fit and safe for its ordinary and intended use." (Docket 13 at p. 4).   Plaintiffs have not pled a breach of an express warranty. Id.   South Dakota adopted the Uniform Commercial Code governing the law of warranties in sales.   SDCL § 57A-2-315 provides:

> Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that *the buyer is relying on the seller's skill or judgment to select or furnish suitable goods*, there is unless excluded or modified under § 57A-2-316 an implied warranty that the goods shall be fit for such purpose.

SDCL § 57A-2-315 (emphasis added).

Plaintiffs are not "buyers" under the statute, and the undisputed facts show they did not purchase the cambering machine from TJW.   See SDCL § 57A-2-103(1)(a).   Plaintiffs have offered no facts indicating they relied on TJW's skill or expertise in any way.   No genuine issue of material fact exists on this claim.   TJW's motion for summary judgment is granted on plaintiffs' breach of implied warranty claim.

### 3.     Hydradyne's Motion for Summary Judgment

Hydradyne moves for summary judgment on two theories: (1) successor liability has not attached to it; and (2) it had no continuing duty to warn users about the cambering machine.

#### A.     Successor Liability

"It is well established under South Dakota law that a corporation which purchases the assets of another corporation does not succeed to the liabilities of

23

the selling corporation." Mitchell Mach., Inc. v. Ford New Holland, Inc., 918

F.2d 1366, 1370 (8th Cir. 1990) (citing Hamaker v. Kenwel-Jackson Mach., Inc.,

387 N.W.2d 515, 518 (S.D. 1986).   However, there are four exceptions to the

general rule under which liability may be imposed on a purchasing corporation.

They are:

> (1)    when the purchasing corporation expressly or impliedly agrees to assume the selling corporation's liability;
>
> (2)    when the transaction amounts to a consolidation or merger of the purchaser and seller corporations;
>
> (3)    when the purchaser corporation is merely a continuation of the seller corporation; or
>
> (4)    when the transaction is entered into fraudulently to escape liability for such obligations.

Hamaker, 387 N.W.2d at 518 (quoting Jones v. Johnson Mach. & Press Co., Etc.,

320 N.W.2d 481 (1982)).

> The South Dakota Supreme Court cautions these exceptions
>
> [E]volved under the traditional rules applicable to corporate law. They have, however, undergone some expansion under the law of products liability.  Strict liability in tort for defective products applies regardless of negligence or privity.  Liability for defective products rests on the need to compensate eligible plaintiffs; thus, the burden of economic loss is shifted not just to the manufacturer of the defective product, *but also at times to the successor manufacturer who by purchasing assets from the predecessor is able to continue making the same or similar products.*

Parker v. W. Dakota Insurors, Inc., 605 N.W.2d 181, 185 (S.D. 2000) (emphasis

added).

As an initial matter, the court finds Hydradyne entered into a purchase agreement with Cambco for its assets.   See Docket 42-1 (Hydradyne-Cambco purchase agreement).   Hydradyne can only succeed to Cambco's liability under one of the four exceptions enumerated above.   The parties agree the two exceptions at issue in this case are the *de facto* merger exception and the continuation exception.   See Dockets 55 at p. 2 (Plaintiffs state that only those two exceptions are relevant.); 58 (Hydradyne only argues those two exceptions.). "The South Dakota Supreme Court has held that commonality of the officers, directors, and stockholders is the most important element of a 'continuation,' and have declined to impose corporate successor liability in the absence of such commonality, even if the remaining factors of the 'mere continuation' test are present." Global Polymer Indus., Inc. v. C & A Plus, Inc., No. 05-4081, 2006 WL 3743845, at *3 (D.S.D. Dec. 14, 2006) (citing Hamaker, 387 N.W.2d at 518); see also Mitchell Mach., 918 F.2d at 1371.

"The South Dakota Supreme Court has indicated that cash consideration is sufficient to establish a prima facie case of continuation of a successor corporation's responsibility for liability if":

(1)     There was basic continuity of the enterprise of the seller corporation, including, apparently, a retention of key personnel, assets, general business operations, and the corporate name.

(2)     The seller corporation ceased ordinary business operations, liquidated, and dissolved soon after distribution of consideration received from the buying corporation.

> (3)     The purchasing corporation assumed those liabilities and obligations of the seller ordinarily necessary for the continuation of the normal business operations of the seller corporation.
>
> (4)     The purchasing corporation held itself out to the world as the effective continuation of the seller corporation.

Global Polymer, 2006 WL 3743845, at *2 (quoting Hamaker, 387 N.W.2d at 519

(quoting Turner v. Bituminous Cas. Co., 244 N.W.2d 873, 883-84 (1976))).[9]

### i.     Continuation Exception[10]

Hydradyne's reliance on the Texas Franchise Tax Public Information

Report ("The Tax Report") to demonstrate Cambco's corporate viability is

misplaced.   See Docket 41-7.   In the April 1, 2008, purchase agreement,

Hydradyne acquired full and exclusive access, use and possession of all of

Cambco's "plans, drawings, specifications, customer records, website, . . .

---

[9]In Hamaker, the South Dakota Supreme Court cited with approval the *prima facie* test for establishing the continuation of a successor corporation's responsibility for products liability espoused in Turner.   Hamaker, 387 N.W.2d at 519.   In dicta, the Court determined it would not follow Turner based on the specific facts of that case.   Id. ("[W]e are not persuaded to follow Turner in this case where . . . ."); see also Groseth Int'l, Inc. v. Tenneco, Inc., 410 N.W.2d 159, 176 (S.D. 1987) (The South Dakota Supreme Court observed that it refused to apply the continuation exception noted in Turner, but then noted in that case plaintiff failed to establish the requisite four elements to satisfy the continuation exception.).

[10]The South Dakota Supreme Court identified the same test to determine whether a plaintiff has satisfied the criteria for either *de facto* merger or the continuation exception.   Compare Groseth Int'l, 410 N.W.2d at 175-76 (outlining the four elements necessary to constitute the *de facto* merger) with Hamaker, 387 N.W.2d at 519 (identifying the same factors to satisfy the continuation exception).   The court collectively references this standard as the continuation exception.

telephone number, business records, marketing information, pricing information, and any other documents and information, whether stored in written form or solely on computer, relevant or relating to the design, production, and/or sale of cambering machines designed by [Cambco]."   (Docket 42-1 at p. 2).   Hydradyne also acquired "the exclusive right to build the cambering machines designed by [Cambco]," id., as well as the "exclusive right to sell 'hydraulics and design kits' for cambering machines."   Id. at 3.   It was also understood and agreed between Hydradyne and Cambco that Hydradyne "will sell the cambering machines it builds to customers of its own, as well as to the current and former customers of [Cambco]."   Id. at 5.

Approximately six months later on October 2, 2008, Robert Matlock, Sr., the sole owner of Cambco, passed away.   (Docket 47-1).[11]   The attorney handling Mr. Matlock's proceedings stated:

> In our probate proceedings, we dealt with Cambco, Inc., as a corporation of only nominal value that was solely owned by the Decedent at the time of his death and as having ceased to do business prior to his death due to the illness of Mr. Matlock.   I am advised that Cambco has not conducted any business since Mr. Matlock's death, has no money, no assets, and had no insurance that would insure against the alleged loss.

Id.

Hydradyne asserts successor liability cannot lie because "[e]ven to this day [Cambco] remains a viable and functioning Texas Corporation."   (Docket 39 at

---

[11]The court overrules Hydradyne's objection that Mr. Matlock's letter (Docket 47-1) constitutes inadmissible hearsay.   See Docket 50 at p. 10.   The court finds the letter is admissible under the residual hearsay exception of Fed. R. Evid. 807.

p. 5) (citing Docket 41-7) (The Tax Report")).   The Tax Report indicates the
principal office of Cambco is 320 Sugarberry Circle, Houston, Texas 77024.   Id.
at 2.   However, 320 Sugarberry Circle is a residential address in a gated
community currently occupied by Barbara Wood, the widow of Mr. Matlock as
well as Cambco's president, secretary, director and treasurer.   See Dockets 41-7
at p. 2; 45 at p. 3; 46 at p. 3.

Hydradyne's publicly available website, which advertises Cambco's
cambering machines, identifies Cambco's address is 1019 Rankin Road,
Houston, Texas 77073.   Hydradyne, https://www.hydradynellc.com/t-p_
cambering_machines.aspx (last visited Sept. 29, 2015); see also Docket 46-1.
Plaintiffs served a summons on Charles Bailey, a manager of Cambco, at 1019
Rankin Road, Houston, Texas 77073.   (Docket 24).   Hydradyne also identifies
1019 Rankin Road, Houston, Texas 77073 as the location of its Houston Fluid
and Power office.   Hydradyne, https://www.
hydradynellc.com/t-p_locations.aspx (last visited Sept. 29, 2015).

Save for receiving money from Hydradyne as part of the ten-year payment
plan called for by the 2008 purchase agreement, the court fails to see how
Cambco can be viewed as a viable corporation.   To find otherwise would be to
place form over substance.   Hydradyne purchased the vast majority, if not all, of
Cambco's revenue producing assets and markets and sells Cambco machines.
Cambco ceased to do business less than six months after the execution of the
purchase agreement due to Mr. Matlock's terminal illness.   Hydradyne

continues to market and sell Cambco products.   Hydradyne did not expressly contract to avoid any of Cambco's liabilities.   Cf. Hamaker, 387 N.W.2d at 519 (noting that the defendant expressly contracted not to assume any of the prior corporation's liabilities).

Hydradyne focuses on the lack of "commonality of the officers, directors, and stockholders in the predecessor and successor corporations" as demonstrating plaintiffs failed to satisfy the requirements for the continuation exception.   Hamaker, 387 N.W.2d at 518 (describing the commonality of key personnel requirement as the "key element").   Mr. Matlock, the sole owner and primary business contractor of Cambco,[12] fell ill and passed away six months after the execution of the purchase agreement.   Under these circumstances, it is obvious that Mr. Matlock could not join Hydradyne's key personnel structure.

The court will not ignore the continuation exception on the basis of Mr. Matlock's death where the other requirements are satisfied.   The court is reminded of the South Dakota Supreme Court's cautionary note that the exceptions to the general prohibition against successor liability has "undergone some expansion under the law of products liability [and] . . . the burden of economic loss is shifted . . . at times to the successor manufacturer who by

---

[12]Mr. Matlock carried out the day-to-day activities of Cambco and entered into enterprise-level contracts on behalf of Cambco.   See Dockets 41-4 at p. 2 (organizing the shipping of the cambering machine);   42-1 at p. 7 (Mr. Matlock signed the Hydradyne purchase agreement on behalf of Cambco.).

purchasing assets from the predecessor is able to continue making the same or similar products." Parker, 605 N.W.2d at 185.

The court received conflicting evidence regarding the viability of Cambco's corporate enterprise as well as the status of its key personnel. Viewing the evidence in the light most favorable to the nonmoving party, a genuine issue of material fact exists as to whether plaintiffs can satisfy the continuation exception, and therefore, whether Hydradyne may be held liable as the successor corporation. Hydradyne's motion for summary judgment on the basis of its successor liability defense is denied.

**B.    Duty to Warn**

Hydradyne asserts it was under no obligation to warn users about the cambering machine. (Docket 39 at p. 10). Although the court can find no South Dakota case specifically analyzing the issue of a successor corporation's post-sale duty to warn users of an allegedly defective product, existing Eighth Circuit precedent provides guidance.

"Unlike a cause of action alleging corporate successor liability, which necessarily focuses on the 'nature of the transaction' between the corporate transferor and its transferee . . . liability for an independent failure to warn depends upon the nature of the relationship between the successor and the predecessor's customers." Sherlock v. Quality Control Equip. Co., 79 F.3d 731, 734 (8th Cir. 1996) (citations omitted).

30

Courts evaluating whether a sufficient relationship exists between a successor corporation and the predecessor corporation's customers to impose a duty to warn generally consider four factors.  Id.   These elements include: "(1) succession to a predecessor's service contracts; (2) coverage of the particular machine under the contract; (3) service of that machine by the purchaser-corporation; and (4) the purchaser-corporation's knowledge of defects and of the location or owner of that machine."   Id. (quoting Tucker v. Paxson Mach. Co., 645 F.2d 620, 626 (8th Cir. 1981)); see also Gamradt v. Fed. Labs., Inc., 380 F.3d 416, 421 (8th Cir. 2004); Travis v. Harris Corp., 565 F.2d 443, 449 (7th Cir. 1977); Nna v. Wabtec Corp., Civil Action No. A. 06-11950-DPW, 2008 WL 1720943, at *3 (D. Mass. Mar. 31, 2008).

The Eighth Circuit cautions that these factors are "merely useful tools which provide guidance in resolving the ultimate inquiry: whether there is an adequate nexus between the successor and the predecessor's customers." Sherlock, 79 F.3d at 734; see also Downtowner, Inc. v. Acrometal Prods., Inc., 347 N.W.2d 118, 125 (N.D. 1984) ("This listing [of factors] cannot be said to be exhaustive.   Rather than relying upon specific factors, the courts appear to have employed a risk/benefit analysis to determine whether it would be just to impose such a duty.").   The Eighth Circuit explains:

> The critical element required for the imposition of the duty is a continuing relationship between the successor and the predecessor's customers for the benefit of the successor. Hence, rather than relying only on the four specific factors above, which are not exhaustive in establishing a nexus between the successor and its predecessor's customers sufficient to justly impose an

31

> independent duty to warn upon notice of dangers or potential dangers, the courts also employ a risk/benefit analysis. Thus, the focus in deciding whether the relationship between the successor corporation and the preexisting customer is sufficient to create a duty to warn has been upon the actual or potential economic advantage to the successor corporation.

Sherlock, 79 F.3d at 734 (internal quotation marks omitted) (quoting 15 William M. Fletcher, Fletcher Cyclopedia of the Law of Private Corporations § 7123.08 (perm. ed. rev. vol. 1990); see also Gamradt, 380 F.3d at 421.

It is undisputed that Hydradyne did not have any service agreements in place with Dakota Steel or TrueNorth.   (Docket 40 at ¶¶ 12-13).   "From 2002 until 2012 Dakota Steel and TrueNorth used the cambering machine without incident."   Id. at ¶ 14.   Adam's death is the first such incident Hydradyne was made aware of involving a cambering machine.   Id. at ¶ 18.   Hydradyne first learned of Adam's death in May 2012.   Id. at ¶ 17.   Other than Hydradyne acquiring Cambco's customer list in the 2008 purchase agreement, plaintiffs have offered no evidence demonstrating Hydradyne had a continuing economically advantageous relationship with Cambco's customers.   See Gamradt, 380 F.3d at 421.   Furthermore, it is undisputed that Hydradyne was unaware of the alleged design defect prior to May 2012, after Adam's death by the cambering machine.   Hydradyne cannot owe a duty to warn about a defect it did not know existed.   Id.   Hydradyne's motion for summary judgment is granted with respect to plaintiffs' duty to warn claims.

32

4.      **Hydradyne's Motion to Compel.**

Defendant Hydradyne filed a motion to compel.   (Docket 32).

Hydradyne, under an agreement with plaintiffs' counsel, filed a motion to extend

the deadline in which plaintiffs must respond to Hydradyne's motion to compel,

citing "a tentative agreement that would resolve . . . the motion to compel

regarding counseling and medication records."  (Docket 36).   The court granted

Hydradyne's unopposed motion.   (Docket 37).   Plaintiffs filed a memorandum

resisting Hydradyne's motion to compel.   (Docket 49).   Hydradyne filed a reply

to plaintiffs' opposition to its motion to compel.   (Docket 51).

At issue in Hydradyne's motion to compel is whether plaintiffs must

produce documents responding to Hydradyne's second, third and fourth

requests for production.

> **REQUEST 2:** Produce all records related to marriage or individual
> counseling for Kenneth Klynsma and Linda Klynsma, and Adam
> Klynsma.
>
> **REQUEST 3:** Produce all records related to the prescription and
> purchase of any medication for depression or any other mental
> disorder suffered by Kenneth Klynsma, Linda Klynsma and Adam
> Klynsma.
>
> **REQUEST 4:** Produce all records related to any charges brought
> against Adam Klynsma and any resolution of those charges, whether
> made while Adam Klynsma was a juvenile or as an adult.

(Docket 33 at pp. 6-7).

Defendants' requests for production are designed to uncover information

regarding the potential damages plaintiffs could recover if successful in their

wrongful death claim.   (Docket 33 at p. 1); see also Docket 13 at p. 5 (amended complaint).   Hydradyne complied with Fed. R. Civ. P. 37(a)(1) and D.S.D. Civ. LR 37.1 by attempting in good faith to resolve its differences with plaintiffs before bringing the motion to compel.   (Docket 34-4).

       "Rule 26(b) of the Federal Rules of Civil Procedure is widely recognized as a discovery rule which is liberal in scope and interpretation, extending to those matters which are relevant and reasonably calculated to lead to the discovery of admissible evidence."   Hofer v. Mack Trucks, Inc., 981 F.2d 377, 380 (8th Cir. 1992).   "While the standard of relevance in the context of discovery is broader than in the context of admissibility (Rule 26(b) clearly states that inadmissibility is no grounds for objection to discovery) . . . ."   Id. (referencing Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 350-51 (1978)).   A party seeking discovery is merely required to make a threshold showing of relevance, which is more relaxed than the showing required for relevance in the context of admissibility.   Id. at 351.

     The party resisting production of discovery bears the burden of establishing lack of relevancy or that complying with the request would be unduly burdensome.   See St. Paul Reinsurance Co. v. Commercial Financial Corp., 198 F.R.D. 508, 511 (N.D. Iowa 2000).   "[T]he mere statement . . . that [an] interrogatory [or request for production] was 'overly broad, burdensome, oppressive [or] irrelevant' is not adequate to voice a successful objection."   Id. (internal citation omitted).   "[T]he party resisting discovery must show specifically how . . . each interrogatory [or request for production] is not relevant

34

or how each question is overly broad, burdensome, or oppressive." Id. at 512
(internal citation omitted).

"Because the interrogatories [or requests for production] themselves are
relevant, the fact that answers to them will be burdensome and expensive is not
in itself a reason for refusing to order discovery which is otherwise appropriate."
In re Folding Carton Antitrust Litigation, 83 F.R.D. 260, 265 (N.D. Ill. 1979)
(internal quotation marks and citation omitted).   "[T]he fact that answering the
interrogatories [or requests for production] will require the objecting party to
expend considerable time, effort and expense consulting, reviewing and
analyzing huge volumes of documents and information is an insufficient basis to
object." Burns v. Imagine Films Entertainment, Inc., 164 F.R.D. 589, 593
(W.D.N.Y. 1996) (internal quotation marks and citation omitted).

"In every action for wrongful death the jury may give such damages as they
may think proportionate to the pecuniary injury resulting from such death to the
persons . . . for whose benefit such action shall be brought."   SDCL § 21-5-7.
In order to recover damages in a wrongful death claim brought on behalf of a
deceased adult child, a parent-plaintiff must establish "the child's willingness
and ability during his majority to furnish support for his parents."   Hodkinson
v. Parker, 16 N.W.2d 924, 927 (S.D. 1944).

> **REQUEST 2:** Produce all records related to marriage or individual
> counseling for Kenneth Klynsma and Linda Klynsma, and Adam
> Klynsma.

(Docket 34-3 at p. 1).   Plaintiffs responded: "[a]ny counseling or marriage
records related to Kenneth and Linda Klynsma are objected to as irrelevant

and not likely to lead to the discovery of admissible evidence.   Relative to Adam Klynsma, we are not aware of any." Id. at 3.

Hydradyne's motion to compel the disclosure of Adam's counseling records is denied as moot as no records exist.   Because Linda Klynsma expressly disavowed a claim for loss of financial support as a result of Adam's death, Hydradyne's motion to compel is irrelevant and is denied.   (Dockets 33 at p. 1; 34-1 at pp. 2-3; 33 at p. 1).   With regard to Kenneth Klynsma, plaintiffs failed to carry their burden of establishing the information is not relevant to Adam's willingness to furnish support to Kenneth, especially in light of Kenneth's alleged abusive behaviors.   See Docket 34-1 at pp. 3-4, 8-10; 52-8 at p.12; 52-9 at pp. 2-3).   Plaintiffs are ordered to produce Kenneth Klynsma's individual and marriage counseling records.

> **REQUEST 3:** Produce all records related to the prescription and purchase of any medication for depression or any other mental disorder suffered by Kenneth Klynsma, Linda Klynsma and Adam Klynsma.

(Docket 34-3 at p. 2).

Plaintiffs responded: "[c]oncerning Kenneth and Linda Klynsma, this Request is objected to as it is asking for irrelevant information which is not likely to lead to the discovery of admissible evidence.   As far as Adam is concerned, there are none." Id.   In accord with the ruling regarding Hydradyne's second request for production, the request is denied as moot as to Adam, denied as irrelevant as to Linda and granted as to Kenneth.   Plaintiffs are ordered to

36

produce Kenneth Klynsma's prescription and medication information relating to depression or any other mental disorders.

> **REQUEST 4:** Produce all records related to any charges brought against Adam Klynsma and any resolution of those charges, whether made while Adam Klynsma was a juvenile or as an adult.

(Docket 34-3 at p. 2).

Plaintiffs responded: "[a]ny records pursuant to this request are objected to as asking for irrelevant information that is not likely to lead to the discovery of admissible evidence." Id.   Plaintiffs' objection that Adam's adult criminal record is not relevant is overruled.   Adam's adult criminal record is relevant to his expected lifetime earnings and the aid, support and assistance he would have been able to provide to Kenneth.

With regard Adam's juvenile criminal record, Hydradyne's motion to compel is denied.   Adam was twenty-six years old at the time of his death and was employed as a trained welder.     (Docket 49 at p. 1).   He was eight years beyond his eighteenth birthday and even further removed from any juvenile transgressions.   He obtained employment as a welder notwithstanding his juvenile record, if any.   Adam's future earnings and any parental support he would have provided are properly evaluated in light of his earnings as an adult. Hydradyne's cited authority is not persuasive as all of the referenced cases appear to involve actions brought on behalf of a juvenile rather than adult decedent.   See Chatman v. City of Chicago, No. 13 C 5697, 2014 WL 1813172, at *1 (N.D. Ill. May 5, 2014); Harrelson v. Dupnik, No. CV-11-00411-TUC-FRZ

37

(BPV), 2014 WL 2510530, at *15 (D. Ariz. Mar. 12, 2014) <u>report and</u>
<u>recommendation adopted as modified</u>, No. CV11-411-TUC-FRZ (BPV), 2014 WL
2510569 (D. Ariz. June 4, 2014); <u>Hamilton v. D.C.</u>, 152 F.R.D. 426, 427 (D.D.C.
1994); <u>see</u> <u>also</u> Docket 49 at p. 2, n.1.   Plaintiffs are ordered to produce Adam
Klynsma's adult criminal record.

## CONCLUSION

TJW's motion for summary judgment is granted with respect to plaintiffs'
breach of warranty claim and denied as to the remainder of plaintiffs' claims.
Hydradyne's motion for summary judgment is granted with respect to plaintiffs'
strict liability and negligent failure to warn claims and denied as to the
remainder of plaintiffs' claims.   Hydradyne's motion to compel is granted in part
and denied in part consistent with this order.

## ORDER

Based on the above analysis, it is

ORDERED TJW's motion for summary judgment (Docket 59) is granted in
part and denied in part.

IT IS FURTHER ORDERED that Hydradyne's motion for summary
judgment (Docket 38) is granted in part and denied part.

IT IS FURTHER ORDERED that Hydradyne's motion to compel (Docket 32)
is granted in part and denied in part.

IT IS FURTHER ORDERED that discovery will recommence thirty (30) days after the date of this order.   See Docket 88 at p. 7.   An order setting a pretrial conference and trial dates will follow.

Dated September 30, 2015.

BY THE COURT:

/s/ *Jeffrey L. Viken*

JEFFREY L. VIKEN
CHIEF JUDGE